**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **REGINA WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **PUBLISH** |
| | ) | |
| **v.** | ) | **CIVIL ACTION 09-0286-WS-N** |
| | ) | |
| **THYSSENKRUPP STEEL USA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on the parties' cross-motions for summary
judgment. (Docs. 71, 75). The parties have submitted briefs and evidentiary materials in
support of their respective positions, (Docs. 72-74, 76-79, 83-88, 92-96, 100, 104),[1] and
the motions are ripe for resolution. After carefully considering the foregoing, the Court
concludes that the plaintiff's motion is due to be denied and that the defendant's motion
is due to be granted.

## BACKGROUND

The plaintiff, who is African-American, was hired by the defendant as a lead
operations controller at a salary of $85,000, a target bonus of 10%, and two weeks
vacation. A few months later, the defendant hired Janet Roberson, who is white, as a lead
operations controller at a salary of $96,000, a target bonus of 10%, and three weeks
vacation. The plaintiff alleges that this disparity in compensation is the product of race

---

[1] Over 1,000 pages in all. This barrage follows the submission of over 600 pages of
material devoted to the plaintiff's two successful motions for discovery sanctions. The Court has
previously described the parties' approach as "litigation overkill," (Doc. 105 at 2), a wasteful
practice that unproductively depletes the resources of both the parties and the Court.

discrimination in violation of 42 U.S.C. § 1981. She demands back pay and benefits (approximately $20,000), plus one million dollars in emotional distress and punitive damages.

## DETERMINATIONS OF UNCONTROVERTED FACT

The plaintiff submitted an application for the position of lead operations controller in June 2008. She was at that time working for another company at a salary of approximately $80,000, plus a bonus of $7,000. (Doc. 88 at 1-2). When interviewed for the position, she advised that she needed to make at least $85,000 in order to accept the position. (*Id*. at 3). After the defendant decided to offer the plaintiff employment, Joyce Redmond, another African-American, recommended that the plaintiff be paid $85,000, with a target bonus of 10%. (*Id*. at 4, 7). Redmond verbally extended the offer, which included the defendant's standard two weeks vacation, and followed up with a consistent offer letter dated June 18, 2008. The plaintiff accepted the offer as presented and did not attempt to negotiate a higher salary or longer vacation. (*Id*. at 8-10).

Roberson submitted an application for the position of lead operations controller in August or early September 2008. During her screening interview, she advised that her salary with her present employer ("Kemira") was $96,000, plus bonus, which was a correct statement. (Doc. 72, Exhibit 1 to Exhibit E; *id*., Exhibit I at 32-33; Doc. 76, Exhibit S; Doc. 83, Exhibit F; Doc. 88 at 19). During her full interview, Roberson expressed her expectation that she would be paid at least the $96,000 she was currently making. (Doc. 88 at 20). She also requested an additional, third week of vacation. (*Id*.; Doc. 72, Exhibit L, ¶ 9). On September 24, 2010, the defendant extended Roberson a written employment offer of $96,000, with a target bonus of 10%. Roberson negotiated for a third week of vacation before accepting the offer. (Doc. 72, Exhibit L, ¶ 11; *id*., Exhibit J at 36-37, 48-49, 53-54; Doc. 83, Exhibit A, and Exhibit B thereto).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  "If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. [citation omitted] If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party."  *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick*, 2 F.3d at 1115.

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

The parties have submitted a large number of exhibits, some of which they have not referred to in their briefs and some of which they have referred to only in part.[2] There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3] Accordingly, the Court limits its review to the exhibits, and the specific portions of the exhibits, which the parties have expressly cited.

Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the Court limits its review to those legal arguments the parties have expressly advanced.

Title VII and Section 1981 "have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Title VII analysis applies as well to Section 1981. *Id.*; *accord Springer v. Convergys Customer Management Group, Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007).

---

[2] By local rule, "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." Local Rule 5.5(c). The same rule applies to depositions. *Id.* Rule 5.5(b). The parties were cautioned in advance to comply with these rules. (Doc. 17 at 6; Doc. 45 at 2).

[3]*E.g., Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."); *accord Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1 (9th Cir. 2001); *see also* Local Rule 7.2.

In Title VII cases not based on direct evidence, the burden is first on the plaintiff to establish a prima facie case. If she succeeds, the employer must meet its burden of articulating one or more legitimate, nondiscriminatory reasons for the adverse employment action. The burden then shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for illegal discrimination. *E.g., Alvarez v. Royal Atlantic Developers, Inc.*, 620 F.3d 1253, 1264 (11th Cir. 2010).

The defendant's burden is usually described as one of articulating a reason "for the adverse employment action." *E.g., Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). To meet its burden, the defendant must articulate a reason "legally sufficient" to justify judgment in its favor and must support the articulated reason "through the introduction of admissible evidence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981); *accord Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 (11th Cir. 2000). "Moreover, this Court has squarely held that an employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made." *Turnes v. AmSouth Bank*, 36 F.3d 1057, 1061 (11th Cir. 1994). Rather, the defendant "must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision." *Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998).

"The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct" but "were a pretext for discrimination." *Crawford*, 529 F.3d at 976 (internal quotes omitted). "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc) (emphasis added). The plaintiff's burden is to

"demonstrate weaknesses or implausibilities in the proffered legitimate reason so as to permit a rational jury to conclude that the explanation given was not the real reason, or that the reason stated was insufficient to warrant the adverse action." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1279 (11th Cir. 2008). Of course, "a reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer,* 509 F.3d at 1349 (emphasis in original) (internal quotes omitted). To make this showing, the plaintiff may resort to "all the evidence," *Crawford*, 529 F.3d at 976, including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

## I. Salary.

### A. Prima Facie Case.

"To state a prima facie case of intentional discrimination in compensation, a plaintiff must establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive the higher wage." *Cooper v. Southern Co.,* 390 F.3d 695, 734-35 (11th Cir. 2004). As discussed in Part I.A.2, the Court questions this formulation, but the parties agree to employ it in this case. (Doc. 73 at 6; Doc. 76 at 3).

#### 1. Similarly situated comparator.

The plaintiff relies solely on Roberson as a comparator. (Doc. 86 at 5 n.1; Doc. 88 at 26). The defendant argues the plaintiff cannot satisfy the third element of her prima facie case because Roberson, although outside the protected class and receiving higher compensation, is not similarly situated to the plaintiff. The defendant says Roberson is not similarly situated to the plaintiff because she had more education and related work

experience than the plaintiff, was earning more at her previous job than the plaintiff, and demanded a higher starting salary than the plaintiff. (Doc. 73 at 7-10; Doc. 92 at 2-8).

In a compensation context, "[t]he plaintiff establishes a prima facie case of [race] discrimination under Title VII by demonstrating that she is [black] and that the job she occupied was similar to higher paying jobs occupied by [whites]." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992). The *Miranda* Court concluded that the plaintiff established a prima facie case simply by showing that she had the same job title, and performed "the same types of tasks," as her comparators who were paid more than she. *Id*. *Miranda* demonstrates that the substantial similarity element, for purposes of a compensation claim under Title VII (and thus Section 1981), is limited to a comparison of job similarity.

The defendant ignores *Miranda*, relying instead on *Cooper*. The *Cooper* Court dealt with the Title VII and Section 1981 compensation claims of five individuals, and it made a number of differing statements about the similarly situated element of the prima facie case. With respect to plaintiff Green, the Court questioned whether her comparators were similarly situated, and the only distinction it identified was that "the jobs they perform are notably different from those of" Green. 390 F.3d at 735.[4] This portion of Cooper is consistent with *Miranda*.[5] Likewise, the Court concluded that plaintiff P. Harris was similarly situated to her comparators, and the only characteristic it identified was that they were "performing the same tasks" as she. *Id*. at 737. This also is consistent with *Miranda*.

_____

[4] The Court did not resolve whether a prima facie case was established, concluding instead that the plaintiff failed to show pretext. 390 F.3d at 735-36.

[5] Indeed, the *Cooper* Court quoted *Miranda* for the proposition that "[t]he comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she 'shared the same type of tasks' as the comparators." *Id*. at 735.

With respect to plaintiff Wilson, the *Cooper* Court concluded that her comparators were not similarly situated, noting that Wilson "has not established that the proposed comparators had similar levels of experience or education, nor has she established the comparators' job responsibilities with any particularity." 390 F.3d at 745. The Court's reliance on the lack of evidence that the comparators had similar duties and performed similar tasks is consistent with *Miranda*, and that circumstance alone required a finding that Wilson's comparators were not similarly situated. Thus, any suggestion in *Cooper* that similarity in experience and education is also required in order to satisfy the prima facie case is dicta. It is also inconsistent with the Court's statement, with respect to plaintiff P. Harris (who established a prima facie case), that differences in "professional experience or formal education," or "superior qualifications," constitute legitimate, non-discriminatory reasons for a pay disparity, *id*. at 737 & n.31, not part of the prima facie case.

With respect to plaintiff McCullers, the *Cooper* Court stated that she had no valid comparators because they "all had more than six years of seniority over" her. 390 F.3d at 743. Finally, with respect to plaintiff S. Harris, the Court concluded that her comparators were not similarly situated because they did not share her history of discipline problems and poor performance. *Id*. at 741.

Just what rule *Cooper* embraces is unclear, since its five separate sections do not appear totally in synch. Some parts are consistent with *Miranda*'s focus on job similarity, while others purport to go beyond it, and the portions that address circumstances beyond job similarity resolve them differently: seniority, disciplinary history and performance history are addressed as part of the prima facie case, but experience and education – and qualifications generally – are not (and even here a cross-current is expressed in dicta).

The threshold question, however, is not how far *Cooper* extends beyond *Miranda* but whether it was empowered to extend *Miranda* at all. *Miranda* was decided first and, under the "prior panel precedent" rule, "a prior panel's holding is binding on all

subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." *United States v. Sneed*, 600 F.3d 1326, 1332 (11th Cir. 2010).

*Miranda* is clear enough in limiting the inquiry to one of job similarity, and neither the defendant nor the Court identifies any sign it has been overruled or abrogated. However, the Court concludes that this portion of *Miranda* is not holding but dicta. In *Miranda*, the trial court held a bench trial on the plaintiff's compensation claim under Title VII and ruled in her favor. Under such circumstances, "the question of whether the plaintiff properly made out a prima face is no longer relevant." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997) (internal quotes omitted); *accord Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (ADA case) ("After a trial on the merits, an appeals court should not revisit whether the plaintiff established a prima facie case [because the question] is no longer relevant.") (internal quotes omitted). This rule predates *Miranda*[6] and so applied to its treatment of the prima facie case, rendering it dicta.

Several other Title VII compensation cases, however, have employed the *Miranda* formulation that only job similarity is to be considered in determining if the plaintiff and her comparator are similarly situated. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1185 (11th Cir. 2005), *aff'd on other grounds*, 550 U.S. 618 (2007); *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 598 (11th Cir. 1994); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1019 (11th Cir. 1994); *EEOC v. Reichold Chemicals, Inc.*, 988 F.2d 1564, 1569-70 (11th Cir. 1993). Some of these cases appear to express the proposition as dicta,[7] but at least one renders it as a holding.

---

[6] *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

[7] *See Ledbetter*, 421 F.3d at 1189 (reversing a jury verdict for the plaintiff because she did not create a jury question as to pretext); *Meeks*, 15 F.3d at 1020 (reversing a bench verdict for the plaintiff because the court did not make a finding of intentional discrimination).

In *Mulhall*, the plaintiff sued for discrimination in compensation under both the Equal Pay Act ("EPA") and Title VII, identifying four groups of comparators. The trial court granted summary judgment as to all claims. As to the Title VII claims, the court ruled the plaintiff did not satisfy the prima facie case as to Groups 2 and 3, because their jobs and/or work conditions were not sufficiently similar to those of the plaintiff. 19 F.3d at 589.

Unlike Title VII, the EPA requires that the plaintiff's comparators work in the same "establishment" as the plaintiff. *Mulhall*, 19 F.3d at 590. In addressing the Title VII claims, the *Mulhall* Court stated that "[t]he absence of an establishment requirement permits the plaintiff to make a Title VII prima facie case on a showing that she is female and her job was substantially similar to higher paying jobs occupied by males." *Id*. at 598 (citing *Miranda*). The *Mulhall* Court thereby unequivocally limited the "similarly situated" requirement to one of job similarity.

The *Mulhall* Court then reversed the grant of summary judgment to the defendant with respect to the Title VII claims involving comparator Group 2, ruling that the plaintiff satisfied her prima facie case because "she raised a genuine issue of material fact regarding the similarity of the positions for the purposes of a Title VII suit." *Id*. at 599. Likewise, the Court ruled that the plaintiff satisfied her prima facie case with respect to Group 3, because she had done so under the EPA, *id*., and "if [a] plaintiff makes a prima facie case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim." *Id*. at 598. The similarity requirement of a prima facie case under the EPA (and thus, per *Mulhall*, Title VII) is limited exclusively to job similarity. *Id*. at 590 (the plaintiff must show "equal work on jobs the performance of which requires equal skill, effort, and responsibility") (internal quotes omitted). For both groups of comparators, the Court further ruled that the plaintiff had presented a jury question as to pretext, and it thereupon vacated summary judgment for the defendants. *Id*. at 599-601.

"[T]he holding of a case is … comprised both of the result of the case and those portions of the opinion necessary to that result by which we are bound." *United States v.*

*Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) (internal quotes omitted).  In order to reverse the grant of summary judgment to the defendants, the *Mulhall* Court was required to decide both that the plaintiff had established a prima facie case and that she had shown a jury issue as to pretext, and in order to decide that the plaintiff had established a prima facie case, it was required to identify what a prima facie case requires and to evaluate whether the plaintiff had satisfied that test.  Accordingly, *Mulhall*'s limitation of the similarly situated inquiry to one of job similarity is a holding, not dicta.

Because *Mulhall* predates *Cooper*, it rather than *Cooper* establishes the controlling rule.[8]  Because the defendant does not assert that the plaintiff cannot establish a prima facie case under the *Mulhall* standard, it is not entitled to summary judgment on this ground.

Even were the Court to rule that *Cooper* rather than *Mulhall* controls, the defendant would not prevail.  The defendant argues that Roberson is not similarly situated to the plaintiff because she had more education and related work experience than the plaintiff.  As discussed above, however, *Cooper* does not appear to sanction the consideration of relative experience or education in assessing the prima facie case.[9]  The defendant argues that the Eleventh Circuit in *Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. 829, 843 (11th Cir. 2006), has done so, but the defendant has not

---

[8] For the same reason, *Mulhall* also trumps *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).  Although uncited by the defendant, *Crawford* ruled that a comparator was not similarly situated because she had more longevity and specialized expertise than the plaintiff.  *Id.* at 975.  Although *Crawford* cites *Mulhall* as support, *Mulhall* stated that such matters are legitimate, non-discriminatory reasons, not that they are relevant to the prima facie case.  19 F.3d at 599 (discussing "seniority" and the comparator's "different skills" as legitimate, non-discriminatory reasons).  Likewise, *Mulhall* trumps the unpublished opinions on which the defendant relies.

[9] As noted, *Cooper*'s reference to education and experience with respect to plaintiff Wilson is dicta.  Although its discussion of education and experience with respect to plaintiff P. Harris is also dicta (since the Court still upheld the trial court's grant of summary judgment, based on a failure to show pretext), it is the clearer expression of the Court's view on the proper place in the Title VII analysis to consider education, experience and qualifications generally.

explained how *Mack* is consistent with *Cooper*. "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Construction, Inc*., 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). Without an effort to harmonize *Mack* with *Cooper* and other precedent,[10] which the defendant does not provide, the Court remains unpersuaded that *Mack* would represent the law of the Circuit even had *Mulhall* left open that possibility.[11]

The defendant also argues that Roberson is not similarly situated to the plaintiff because she was making more than the plaintiff at their respective previous jobs and because she demanded a higher starting salary. *Cooper* does not address such considerations. The defendant relies instead on *Drake-Sims v. Burlington Coat Factory Warehouse, Inc*., 330 Fed. Appx. 795 (11th Cir. 2009), in which the Court held that the plaintiff's comparators were not similarly situated because "both had been hired from other companies and had demanded higher salaries as a condition of leaving their previous employers." *Id*. at 803. Like *Mack*, *Drake-Sims* is unpublished and so is not binding and is persuasive only to the extent its legal analysis warrants.

*Drake-Sims* based its decision on the principle that a comparator must be similarly situated "in all relevant respects." 330 Fed. Appx. at 803 (internal quotes omitted). But simply stating the test begs the question of what is a "relevant respect" in the context of a prima facie case of discrimination in compensation. In determining this, the purpose of requiring a plaintiff to establish a prima facie case must be borne in mind. "The prima facie case serves an important function in the litigation: it eliminates the most common

---

[10] *See Walker*, 158 F.3d at 1193 (a plaintiff alleging failure to hire or promote is not required, at the prima facie case stage, to address the relative qualifications of the successful applicant and the plaintiff).

[11] The Court views *Beard v. 84 Lumber Co*., 206 Fed. Appx. 852 (11th Cir. 2006), which was uncited by the defendant, similarly. While the *Beard* Court suggested that a difference in experience rendered the plaintiff's comparator not similarly situated for purposes of a Title VII compensation claim, it did not attempt to square its decision with *Cooper* or *Mulhall*. *Id*. at 858.

nondiscriminatory reasons for" the adverse employment action. *Burdine*, 450 U.S. at 253-54; *accord Collado v. United Parcel Service Co.*, 419 F.3d 1143, 1151 (11th Cir. 2005). Note that the purpose of the prima facie case is to eliminate "the most common" innocent explanations for the disparity, not all possible explanations (else the analysis would never advance to the "legitimate, non-discriminatory reason" stage). Because of this limited purpose, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253; *accord Rioux*, 520 F.3d at 1275. A "relevant respect," then, must address the most common legitimate reasons for a disparity in treatment. To require more than this runs counter to *Burdine* and converts the prima facie case into an onerous requirement, also contrary to *Burdine*.[12]

No doubt one of the most common reasons for paying one employee more than another is that they occupy different positions and perform different tasks. It was thus appropriate for *Miranda*, *Mulhall* and *Cooper* to conclude that similarity in a compensation context must be measured in terms of job similarity. But the defendant has

---

[12] The "all relevant respects" phrase apparently was introduced into the Eleventh Circuit lexicon by *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The cases from which *Holifield* drew the term trace its lineage to *Burdine*. *E..g., Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985). The Court can find no indication that these courts intended to devise a more demanding test than that contemplated by the *Burdine* Court's foundational statement that "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." 450 U.S. at 258. Given *Burdine*'s explanation of the limited purpose of the prima facie case, it is not likely that it sanctioned a test that would require a plaintiff to address, as part of her prima facie case, more than the "most common nondiscriminatory reasons" for adverse employment decisions of the type contested.

*Drake-Sims* quoted *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004), for the proposition that "all relevant respects" means "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Id.* at 1091. *Wilson*, however, involved an employee terminated for misconduct, *id.* at 1085, and the Eleventh Circuit has long used the "nearly identical" test in that narrow context. *E.g., Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (concluding that "nearly identical" misconduct is required rather than "similar" misconduct, based on the prior panel precedent rule). As far as the Court can determine, no published appellate opinion in this Circuit has ever employed a "nearly identical" standard outside the misconduct context.

offered no reason for the Court to believe that one of the most common reasons for differences in pay is that some people insist on being paid more. That it happens on occasion does not make it a most common reason for pay disparity. The same must be said concerning salaries paid by past employers. Because *Drake-Sims* does not explain how its ruling is consistent with the limited purpose of the prima facie case, the Court is not persuaded that *Drake-Sims* would represent the law of the Circuit even if *Mulhall* did not preclude such a result.[13]

The defendant does not contend that *Cooper* itself resolves the issue whether salaries with former employers and demands for compensation are part of the similarity inquiry. The *Cooper* decision does not directly address these possible distinctions among employees, and it sends no clear signal that such matters should be addressed as part of the prima facie case. By rejecting differences in experience, education and other qualifications as grist for the similarity mill, *Cooper* suggests a modest view of the prima facie case, in keeping with *Burdine*. By embracing differences in seniority, performance and discipline as relevant to the similarity inquiry, *Cooper* indicates a broader view, but one without clear parameters.

The *Cooper* Court's explanation for its decisions does not dispel the uncertainty. With respect to seniority, it said only that "[s]eniority may constitute a legitimate, non-discriminatory justification for differences in compensation." 390 F.3d at 743. But a legitimate, non-discriminatory reason becomes relevant only after the prima facie case has been satisfied, and the Court's explanation thus suggests that seniority should *not* be considered as part of the similarly situated inquiry.

---

[13] The same can be said of *Hill v. Emory University*, 346 Fed. Appx. 390 (11th Cir. 2009), another case uncited by the defendant, in which the Court indicated that a "competing offer of employment" made to the comparator rendered him not similarly situated to the plaintiff. *Id.* at 395. Moreover, this portion of *Hill* is dicta, since the jobs held by the plaintiff and his comparators "involved different responsibilities," *id.*, and that fact alone presumably kept them from being similarly situated.

With respect to differences in performance and discipline, the *Cooper* Court relied on *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir. 1998). *Jones*, however, was not a compensation case but a discharge case. The plaintiff in *Jones* was discharged for poor performance and insubordination, *id.* at 1309-10, which necessarily required that she produce comparators who had not been terminated despite similar performance or discipline issues.

The *Cooper* Court's only other citation to support its view on performance and discipline was to *MacPherson v. University of Montevallo*, 922 F.2d 766 (11th Cir. 1991), a compensation case decided under the ADEA, not Title VII or Section 1981. Twice it cited *MacPherson*'s statement that, "[i]n a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." *Id.* at 774 n.16 (cited by *Cooper*, 390 F.3d at 735-36, 741). Even had *Mulhall* left it open to the *Cooper* Court to expand the requirements of the prima facie case, it is not clear that *MacPherson* supports such an effort, since it speaks expressly of "job-related characteristics," not individual differences. The *Cooper* Court equated footnote 16 with the "all relevant respects" test, 390 F.3d at 735, and, as discussed previously, that test does not clearly allow courts to require plaintiffs at the prima facie case stage to address all possible points of distinction between themselves and their comparators.[14]

Finally, the Court notes that each of the matters beyond job similarity that the *Cooper* Court permitted to be considered as part of the prima facie case – seniority, performance problems and disciplinary history – can be relevant only when both the

---

[14] Title VII and the ADEA bear many similarities, and it presumably was not unreasonable for *Cooper* to conclude that language employed in the ADEA context could be appropriately extrapolated to the Title VII context. However, to the extent, if any, that *MacPherson* frames a broader test of the prima facie case than did *Mulhall*, the latter case precluded *Cooper* from adopting *MacPherson* for use in the Title VII context.

plaintiff and her comparator are existing employees and have a history with the employer. Here, both the plaintiff and her comparator were new hires, and *Cooper* says nothing favorable to the defendant regarding consideration of pre-employment matters in gauging similarity.

Because of these issues, even could *Cooper* be considered despite *Mulhall*, the Court would not extrapolate from *Cooper* that a plaintiff at the prima facie case stage must show that her comparator did not earn more than her at a previous employment or that the comparator did not demand a higher salary than the plaintiff.

### 2. Qualified to receive the higher wage.

As noted, *Cooper* requires the plaintiff to show that she "was qualified to receive the higher wage." No such requirement appears in *Mulhall*, and it is thus not clear how *Cooper* could add it.[15] Nevertheless, because the plaintiff concedes this is part of her prima facie case, (Doc. 76 at 3; Doc. 86 at 4), the Court proceeds.

But not very far. While the defendant asserts that the plaintiff "cannot show that [she] should have received a higher wage," (Doc. 73 at 7, Doc. 85 at 4), it neither articulates what this element requires nor addresses how the plaintiff was not "qualified" to be paid the same as Roberson. Instead, the defendant devotes its argument exclusively to examining whether the plaintiff and Roberson are similarly situated. (Doc. 73 at 6-11; Doc. 85 at 3-7; Doc. 92 at 2-9). The Court will not supply the deficiency in the defendant's argument.

---

[15] The *Cooper* Court adopted this element from *MacPherson,* 390 F.3d at 735, which extrapolated the element without discussion from another ADEA case, V*erbraeken v. Westinghouse Electric Corp*., 881 F.2d 1041 (11th Cir. 1989). *Verbraeken* was a termination case, and the Court required the plaintiff to show he was "qualified to do the job" from which he was terminated. *Id*. at 1045. This is a standard requirement in the termination context, *e.g., Cuddleback v. Florida Board of Education*, 381 F.3d 1230, 1235 (11th Cir. 2004) (Title VII), but of uncertain meaning or utility in the compensation context. The Court has located no Eleventh Circuit case interpreting this portion of *MacPherson*.

**B. Legitimate, Non-Discriminatory Reasons.**

The defendant offers four reasons it paid Roberson more than the plaintiff: (1) Roberson had more experience than the plaintiff; (2) Roberson's salary at her previous employer was higher than the plaintiff's; (3) Roberson expressed a higher salary requirement than did the plaintiff; and (4) Roberson had an MBA, which the plaintiff lacked. (Doc. 72 at 18-19; Doc. 73 at 12). These reasons are legally sufficient and are supported by record evidence.[16] The plaintiff does not argue otherwise. The burden thus shifts back to the plaintiff to establish a fact question as to whether these reasons are a pretext for race discrimination.[17]

**C. Pretext.**

As noted in the determinations of uncontroverted fact, the plaintiff requested at least $85,000 and received $85,000, while Roberson requested at least $96,000 and received $96,000. That is, the plaintiff received exactly what she requested, and Roberson also received exactly what she requested.[18] On its face, this shows that the

---

[16] *Lewis v. D.R. Horton, Inc.*, 375 Fed. Appx. 818, 825 (10th Cir. 2010) (experience, prior salary and salary demand were legitimate, nondiscriminatory reasons for a pay disparity); *Schaffer v. GTE, Inc.*, 40 Fed. Appx. 552, 556 (9th Cir. 2002) (similar).

[17] The plaintiff identifies additional legitimate, non-discriminatory reasons: a recommendation from Redmond, publicly available salary data, and the compensation of other local company controllers. (Doc. 76 at 11). The defendant alone, however, is empowered to select the legitimate reasons it will proffer, and "[n]either the plaintiff nor the court may recast the reason given by an employer for taking or failing to take a particular job action." *Silvera v. Orange County School Board*, 244 F.3d 1253, 1260 (11th Cir. 2001). That the defendant may have asserted these additional reasons before the EEOC does not obligate it to do so on motion for summary judgment.

[18] Both received a target bonus of 10%, and the plaintiff does not allege discrimination in this respect.

plaintiff and Roberson were treated precisely the same, with the difference in result flowing from the plaintiff's more modest salary demand. The plaintiff, however, sees it differently. Her remarkable theory is that, by giving both a white employee and a black employee exactly what they asked, the defendant discriminated between them based on their race.

It is worthwhile to begin by noting what evidence the plaintiff lacks. For starters, she has no evidence that rational employers without a rigid salary scale voluntarily pay their employees more than the employees ask to be paid. Much less does she have evidence that this employer ever hired a white employee at a salary exceeding what the employee requested. In short, she has no evidence that her $85,000 salary was the product of anything other than her own decision, freely made even if ill-advised, to tell the defendant she was willing to work for that amount.

Nor does the plaintiff have evidence that the decision-makers who established the salary offers harbored a racially discriminatory animus. The plaintiff's offer was crafted by Redmond, who is also African-American, and the plaintiff does not even suggest that Redmond suppressed her salary because she is black. The plaintiff insists that Eileen O'Brien was the decision-maker as to Roberson's offer, (Doc. 86 at 22, 24-25), and she also insists that O'Brien encouraged Roberson to apply for the job, and thereafter favored her, because they were friends. (Doc. 78 at 3; Doc. 88 at 18-19, 35). As a matter of law, favoring an employee because of friendship is not favoring the employee because of race. *E.g., Greene v. Potter*, 557 F.3d 765, 771 (7th Cir. 2009); *Swackhammer v. Sprint/United Management Co*., 493 F.3d 1160, 1170-71 (10th Cir. 2007); *accord Caldwell v. State of Washington*, 278 Fed. Appx. 773, 776 (9th Cir. 2008).[19]

_____

[19] "[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera*, 244 F.3d at 1261 n.5. Since Redmond decided the plaintiff's salary and O'Brien decided Roberson's, this principle appears to be in play. However, because the defendant did not assert any such argument, the Court will not consider it.

The foregoing would appear to present formidable obstacles to establishing a genuine issue of material fact as to whether the defendant's articulated reasons for its salary decisions are a pretext for discrimination based on race. The plaintiff floats a veritable armada of arguments in a dogged effort to surmount these barriers, but each is shot through with error. Neither individually nor in combination do the plaintiff's arguments salvage her claim.

First, the plaintiff argues the defendant could not rely on Roberson's salary with Kemira to justify offering her $96,000, because Roberson's salary with Kemira was not $96,000 but approximately $84,000. (Doc. 76 at 7; Doc. 86 at 10, 21; Doc. 95 at 12). The evidence, however, unequivocally refutes the plaintiff's position. She relies on a document from Kemira reflecting an adjustment of Roberson's salary from approximately $80,000 to approximately $84,000 ($3241.62 bi-weekly) on March 31, 2008. (Doc. 76, Exhibit R). However, other documents from Kemira include a correcting entry, also dated March 31, 2008, adjusting Roberson's bi-weekly salary from $3241.62 to $3656.59. (Doc. 83, Exhibit F). The latter figure, annualized, works out to $95,071.34. The plaintiff offers no evidence that Roberson's salary with Kemira ever fell after March 31, and Roberson's sworn testimony that it did not, (Doc. 72, Exhibit K at 32-33), remains unrebutted.

The plaintiff relies as well on Roberson's 2008 W-2 from Kemira, which reflects gross income of $95,092.45. (Doc. 76, Exhibit S). The plaintiff, noting Roberson's $10,000 bonus from Kemira, concludes that the W-2 reflects a salary of approximately $85,000. The plaintiff, however, overlooks that Roberson worked for Kemira only ten months in 2008, not twelve, so the $85,000 figure reflects an average salary well above $96,000.

In short, it is uncontroverted that Roberson had a salary of approximately $96,000 when she applied with the defendant.[20]  Roberson's salary with Kemira thus provides no evidence of pretext.

Second, the plaintiff objects that the defendant violated company policy when it failed to confirm Roberson's salary by contacting Kemira directly.  (Doc. 76 at 7; Doc. 86 at 21).  The only significance of this failure that the plaintiff identifies is that it prevented the defendant from discovering that Roberson's salary was about $84,000.  As noted above, it is uncontroverted that Roberson's salary was about $96,000, so failing to contact Kemira prevented nothing.

"The bending of established rules may, of course, be suggestive of discrimination." *Walker v. Prudential P&C Insurance Co*., 268 F.3d 1270, 1279 (11th Cir. 2002).  However, "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus." *Mitchell v. USBI Co*., 186 F.3d 1352, 1355-56 (11th Cir. 1999).  "To establish pretext, a plaintiff must show that the deviation from the policy occurred in a discriminatory manner." *Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002).  Thus, "*inconsistent* application of employment policies [may be] circumstantial evidence of discrimination." *Berg v. Florida Department of Labor and Employment Security*, 163 F.3d 1251, 1255 (11th Cir. 1998) (emphasis added).  Here, the plaintiff offers no evidence that the defendant contacted the current employers of black applicants but not of white applicants.  On the contrary, it is uncontroverted that the

_____

[20] This discussion also disposes of the canard that O'Brien helped Roberson "falsif[y]" her salary history with Kemira by helping her apply for a 2008 bonus.  (Doc. 86 at 10, 20; Doc. 95 at 12).  It simultaneously eliminates the plaintiff's argument that, even if O'Brien was innocent, the defendant now knows that Roberson "lied" about her salary and yet has not punished her for doing so.  (Doc. 86 at 20 n.5).  Likewise, it renders pointless the plaintiff's argument – the veracity of which the Court does not assess – that the defendant engaged in "extensive efforts to obstruct the production of evidence pertaining to Roberson's salary history."  (*Id*. at 22).

defendant did not contact the plaintiff's employer, either. (Doc. 72, Exhibit B at 40-41; Doc. 83, Exhibit C, ¶ 5 and Exhibit A thereto).

In short, the defendant's failure to contact Kemira about Roberson's salary furnishes no evidence of pretext.

Third, the plaintiff argues that the defendant's maximum starting salary for lead operations controllers was $90,000, such that paying Roberson more violated that policy. (Doc. 76 at 6). This argument as well is factually baseless. The plaintiff relies on testimony from Cecelia Estes, a white female hired as a lead operations controller about the same time as Roberson. During a telephone conversation, O'Brien offered Estes $90,000, and Estes pointed out that she'd been told the range of salaries extended higher than that. Estes heard O'Brien relate this to Redmond, who responded, "Say: This is what our offer is for the position." (*Id.*, Exhibit O at 24, 27).

The plaintiff appears to believe that "offer" means "cap" and "the position" means "all lead operations controllers." But if that were what Redmond meant, that is what Redmond would have said. Redmond was asked about a specific offer for a specific lead operations controller position, and that is how she answered. Any possible doubt on this score is resolved by the plaintiff's evidence that her star witness overheard Redmond arguing with O'Brien over the $96,000 offered Roberson. Barbara Hicks testified that Redmond insisted it would be "unfair" to Estes and the plaintiff to pay Roberson that much "because it was [a] substantially higher salary than that offered to the other controllers." (Doc. 76 at 6; *id.*, Exhibit N at 2). Notably, despite being passionately opposed to paying Roberson $96,000, Redmond did *not* say that this figure exceeded some corporate cap on pay for lead operations controllers, as she certainly would have done had she understood that any such cap existed.

Moreover, and as discussed above, a deviation from policy is evidence of a discriminatory intent only if the deviation occurred in a discriminatory manner. Even if the plaintiff had evidence that Roberson was paid over some salary cap (which she does

not), she offers no evidence that any black applicant or employee in any position was denied a higher salary due to a salary cap.

In sum, there is no evidence of a $90,000 salary cap and no evidence that any such cap was applied in a discriminatory fashion. The plaintiff's argument thus does not constitute evidence of pretext.

Fourth, the plaintiff notes that Estes, although she made $110,000 at her previous position, and although she requested that amount from the defendant, was offered only $90,000. According to the plaintiff, this shows that the defendant did not really rely on salary history and salary demand in setting Roberson's salary. This evidence may indicate that the defendant did not rely exclusively on these considerations,[21] but it fails to suggest that the defendant did not rely on these considerations at all. At most, Estes' situation reflects that the defendant did not treat prior salary or a salary demand as setting a salary *floor*; it does nothing to counter the uncontroverted evidence that the defendant treated salary demand as establishing a salary *ceiling*.

The foregoing discussion exhausts the plaintiff's effort to show that the defendant's asserted reliance on salary history and salary demand is pretextual. She now pivots to an argument that, even if the defendant did rely on these matters, it was legally impermissible to do so. She notes that the Eleventh Circuit "has consistently held that prior salary *alone* cannot justify a pay disparity under the EPA." *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (internal quotes omitted) (emphasis added). It is doubtful that *Irby* could apply in the Title VII context, especially when race discrimination rather than sex discrimination is alleged,[22] but it is in any event irrelevant because the defendant does not rely on prior salary alone, or even on prior salary plus present salary demand alone.

---

[21] The defendant never claimed to have done so; on the contrary, it says it also relied on experience.

[22] Title VII allows a defendant to avoid liability if the pay disparity "is authorized by the provisions of [the EPA]," 42 U.S.C. § 2000e-2(h), but this section expressly limits its application to pay discrimination "upon the basis of sex." *Id.*

Even *Irby* recognizes that prior pay plus experience establishes an affirmative defense under the EPA, *id*. at 955, and the defendant has asserted experience as a legitimate, non-discriminatory reason. The Court thus turns to the plaintiff's attempt to show that the defendant's articulated reliance on experience is a pretext for race discrimination.

In assessing their applications, the defendant calculated that Roberson had eight years of controlling experience and the plaintiff six. (Doc. 86, Exhibit 2). That is, Roberson had more relevant experience than the plaintiff, which would justify a salary disparity. The plaintiff contends that, actually, Roberson had only two years controlling experience while she had eight. Once again, the plaintiff's position is unavailing.

Roberson's application reflects that she worked as plant controller at Kemira for almost two years. Prior to that, she worked for Konica Minolta ("Konica") as senior manager for almost 6½ years. (Doc. 76, Exhibit D at 3). The plaintiff offers no explanation why Roberson's work at Konica cannot be construed as controlling experience, and the Court will not hazard guesses on her behalf. Moreover, Roberson has sworn that she did in fact have eight years controlling experience. (Doc. 72, Exhibit L). On this record, it is uncontroverted that Roberson had eight years controlling experience.[23]

The plaintiff's application reflects four years as a plant controller with TK Presta Steer Tec ("Presta"), several months as a plant controller with Bridgewater Interiors, and 1½ years as business head analyst with GMAC Financial Services. (Doc. 86, Exhibit 1

---

[23] The plaintiff suggests the defendant "expressed concerns regarding Roberson's lack of controlling experience." (Doc. 86 at 5). Even though she admits that Redmond is the one who calculated Roberson's controlling experience at eight years, and even though she admits that Andy Ritter was not the decision-maker, she relies on his testimony that he does not see in Roberson's application the word "controlling" in describing her job with Konica. (Doc. 94, Exhibit 7 at 66-68). He is correct, but the absence of the word does not raise a fact issue as to whether Roberson's job with Konica consisted of controlling experience. One need look no further than the plaintiff's own application, which does not use the term with respect to her time with GMAC Financial Services but which both the plaintiff and the defendant treated as involving controlling experience.

at 17).  The plaintiff confirmed in her deposition that six years controlling experience "sounds correct."  (Doc. 72, Exhibit A at 89).

The plaintiff's argument that she actually had eight years controlling experience depends on her declaration, created specifically in support of her motion for summary judgment, in which she states that, "[p]rior to my employment with defendant, I had over eight years of plant controller experience."  (Doc. 77 at 1).  The defendant moved to strike this statement as irreconcilable with the plaintiff's deposition testimony, (Doc. 84 at 8-9), and the plaintiff elected not to oppose the motion.

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc*., 736 F.2d 656, 657 (11th Cir. 1984).  "This rule is applied sparingly because of the harsh effect [it] may have on a party's case."  *Allen v. Board of Public Education*, 495 F.3d 1306, 1316 (11th Cir. 2007) (internal quotes omitted).  "[T]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the ... affiant ... was telling the truth."  *Id*. (internal quotes omitted).  Thus, there must be an "inherent inconsistency" between affidavit and deposition before the former may be disregarded as sham.  *Id*.; *accord Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1237 (11th Cir. 2010).  Otherwise, "the general rule allowing an affidavit to create a genuine issue even if it conflicts with earlier testimony in the party's deposition ... governs."  *Rollins v. TechSouth, Inc*., 833 F.2d 1525, 1530 (11th Cir. 1987) (internal quotes omitted).

The plaintiff's declaration offers no explanation for upping her controlling experience to eight years.  However, the defendant has not shown that its question and the plaintiff's response were so precise as to render her declaration in hopeless conflict with her deposition testimony.  At the plaintiff's deposition, defense counsel noted the

defendant's assessment of her controlling experience as being six years and asked, "Does that sound correct to you?" The plaintiff responded in kind, "That sounds correct." (Doc. 72, Exhibit A at 89). Notably, the defendant did not ask the plaintiff whether six years *is* correct, but only whether it *sounds* correct, and the plaintiff's answer did not purport to be more precise than the question. By asking whether six years "sounds" correct, the defendant invited later correction upon further reflection or review of records. The Court concludes that the plaintiff's declaration should not be stricken as sham.

Consideration of the plaintiff's declaration, however, does not advance her pretext argument. As noted, the plaintiff's application reflects only six years of controlling experience,[24] and the plaintiff does not assert that she ever told the defendant she actually had more controlling experience than appears on her application. Whatever the plaintiff's actual controlling experience might be, the defendant could not give her credit for it in formulating a starting salary unless she brought it to the defendant's attention. Since she did not do so, for all purposes relevant to this lawsuit the plaintiff had but six years controlling experience.

In short, it is uncontroverted that Roberson had eight years controlling experience and, to the defendant's knowledge, the plaintiff had only six. Roberson thus had more controlling experience than the plaintiff, and this disparity weakens rather than strengthens the plaintiff's showing of pretext.

Undeterred, the plaintiff posits that she had 14 years accounting experience to Roberson's 11. (Doc. 86 at 5). Again the facts are not on her side. The plaintiff may have had 14 years of such experience, but the uncontroverted evidence is that Roberson

---

[24] An attached resume reflects that the plaintiff also worked eight months through a temp agency as a financial analyst; worked 6½ years as a finance supervisor; and worked 4½ years as an accounting assistant. (Doc. 86, Exhibit 1 at 13-14). The plaintiff has not explained how any of this work could be construed as controlling experience, and none of it lasted two years.

had at least 19.  (Doc. 76, Exhibit F).[25]  It is also uncontroverted that the defendant understood that the plaintiff had 14 years experience and Roberson 19.  (Doc. 86, Exhibit 2).  Roberson's more lengthy experience again undercuts the plaintiff's effort to show pretext.

Unwilling to let go, the plaintiff insists that her prior work for Presta compensates for her multi-year deficit in experience, on the grounds that Presta is an "affiliate company" of the defendant.  (Doc. 76 at 10).  There are only three problems with this argument.  First, there is no evidence that Presta is meaningfully related to the defendant; the plaintiff herself admits there is "no relationship" between them.  (Doc. 72, Exhibit A at 42).[26]  Second, there is no evidence that the defendant valued experience with Presta so highly as to render an applicant with such experience equally qualified with another applicant having several years more actual relevant experience.  Third, the plaintiff offers no basis for assuming that a reasonable employer would so highly prize work with an essentially unrelated organization.  The Presta argument goes nowhere.

Even could the plaintiff show herself to be as experienced as Roberson, her cause would not be advanced.  Roberson's experience could be reflected in an offer of $96,000 because Roberson demanded to be paid that much.  The plaintiff, in contrast, had freely limited her salary demand to $85,000, and she has offered no evidence that any reasonable employer, much less this one, would unilaterally offer an applicant more than the applicant demands.  The plaintiff effectively imposed on herself a salary cap of $85,000, regardless of whether her experience would have justified a higher salary.

_____

[25] Roberson's application does not, as the plaintiff suggests, (Doc. 95 at 10, n.2), render this impossible, since it discloses neither Roberson's age nor the year she obtained her bachelor's degree.

[26] The defendant acknowledges that it and Presta are both subsidiaries of ThyssenKrupp but denies any connection between the two.  (Doc. 83 at 2).

Thus, paying Roberson more than an equally (or even more) experienced plaintiff could not suggest that Roberson was paid more because of her race.

Unable to show that she herself is as experienced as Roberson, the plaintiff argues that Estes is. She continues that, since Estes is more experienced than Roberson but was paid less, the defendant must not really have considered experience in establishing Roberson's salary. (Doc. 86 at 12-13). Since Estes had 18 years controlling experience to Roberson's eight, (Doc. 88 at 14), it may be assumed that Estes is more experienced than Roberson.[27] This circumstance, however, does not aid the plaintiff's case but hurts it. Estes is white, so Roberson's higher salary cannot plausibly be based on race. Instead, the most obvious explanation for paying Roberson more than Estes – despite Estes' greater experience, higher current salary and higher salary demand – is O'Brien's favoritism towards Roberson, which the plaintiff admits was based on friendship.[28]

In her reply brief, the plaintiff injects a new argument: that Roberson did not meet the minimum stated educational qualification for the position because her degree is in business administration, while the defendant's notice called for a degree in accounting or finance. (Doc. 95 at 8-9 n.1). District courts, including this one, ordinarily do not consider arguments raised for the first time on reply.[29] The plaintiff offers no reason the

---

[27] The parties agree that Estes has 18 years controlling experience, (Doc. 88 at 14), but it is not clear that the defendant was aware of this when Estes was hired, since the contemporaneous document summarizing her experience credits her with only seven years controlling experience. (Doc. 86, Exhibit 2).

[28] The plaintiff's related effort to paint as suspicious Estes' present position in a supervisory role over Roberson, yet with a salary only equal to Roberson's, (Doc. 76 at 12-13; Doc. 86 at 13-14), stumbles for the same reasons.

[29] *See Park City Water Authority v. North Fork Apartments, L.P.*, 2009 WL 4898354 at *1 n.2 (S.D. Ala. 2009) (citing cases from over 40 districts applying the rule in 2009 alone). The Eleventh Circuit follows a similar rule. *E.g., Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted).

Court should depart from the rule in this case, and the Court declines to do so.[30]  At any rate, Roberson has not shown that an accounting or finance degree was an absolute requirement for the position.[31]

The plaintiff trots out a number of additional arguments, not directly tied to any of the defendant's articulated reasons for its salary decisions.  First, she notes that Roberson had performance problems which led to her being subject to a four-month performance improvement plan ("PIP") in 2009, yet she did not experience a reduction in salary. (Doc. 76 at 9).  The relevance of this post-hiring conduct to a claim alleging discrimination in starting salaries is unclear.  Nor has the plaintiff attempted to show that black employees placed on a PIP did have their salaries reduced, or to show otherwise that the failure to lower Roberson's salary was based on race.

Second, the plaintiff complains that, while the defendant reviewed publicly available salary data before offering her $85,000, it reviewed different publicly available

_____

[30] The Court has identified some of the reasons supporting the rule as follows.  "In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief."  *Hardy v. Jim Walter Homes, Inc.*, 2008 WL 906455 at *8 (S.D. Ala. 2008).

These and similar reasons favor adhering to the rule here.  First, the plaintiff had not one but two opportunities to assert her tardy argument prior to her reply brief:  her principal brief in support of her own motion for summary judgment and her opposition to the defendant's motion. She desires now not a second but a third bite at the apple.  Moreover, she has submitted almost 150 pages of briefing and related materials (plus 286 pages of exhibits) raising almost countless arguments concerning pretext, and it would improperly reward her scattered and excessive approach to allow her to insert yet another argument at this late date.

[31] The job description on which the plaintiff relies says only that "[w]e seek candidates with" an accounting or finance degree, (Doc. 94, Exhibit 5), not that "we require" such a degree. Indeed, the plaintiff concedes that "both plaintiff and Roberson possess the academic credentials required by the defendant for its lead operations controllers."  (Doc. 86 at 12; *accord* Doc. 95 at 8).

salary data before offering Roberson $96,000, and she believes this raises an inference that racial considerations were involved. (Doc. 86 at 23-24). The plaintiff has not explained how the slight modification in online salary data could have worked to her disadvantage. The uncontroverted evidence is that the data was used for the limited purpose of ensuring the defendant did not pay outside the wide range reflected in the data, (Doc. 76, Exhibit P at 40-41), and both Roberson's pay and the plaintiff's fell within these parameters. (Doc. 85, Exhibit B). Moreover, while the plaintiff insists that O'Brien was the decision-maker as to Roberson's salary, she does not contest the defendant's uncontroverted evidence that Redmond was the individual who collected the online salary data for both the plaintiff and Roberson. (Doc. 76, Exhibit P at 34, 40-41). As noted, the plaintiff does not assert that Redmond harbored any discriminatory motive.

Third, the plaintiff asserts that, when she and her supervisor told CFO Markus Boening they suspected race discrimination in pay, he rejected their request to investigate. (Doc. 86 at 19). The evidence on which the plaintiff relies does not support this story, since it says nothing about an articulated suspicion that race was the reason for the disparity and says nothing about a request to investigate. All it shows is that the plaintiff and her supervisor expressed that she (not the supervisor) felt her salary was too low compared to Roberson's and that Boening responded that he felt the salaries in the controller department were in an acceptable range. (Doc. 87, Exhibit 2 at 68-72).

Fourth, the plaintiff argues that, when she registered an anonymous complaint on the company hotline of race discrimination in compensation, the defendant botched the investigation by: (1) "revealing" her as the complainant; (2) allowing Andy Ritter to investigate even though the complaint alleged discrimination in the human resources department he headed and in which he was at least tangentially implicated (since he approved Redmond's and O'Brien's salary recommendations); and (3) closing the investigation without interviewing the plaintiff or Redmond or considering the plaintiff's qualifications relative to Roberson. (Doc. 86 at 16-17). Since the plaintiff insists that O'Brien decided Roberson's salary and that Ritter was but an innocent "rubber stamp,"

(Doc. 86 at 22; Doc. 95 at 15), it is unclear and unexplained how either his participation in the investigation or its asserted imperfections could suggest that O'Brien's decision was based on race. The plaintiff's own evidence reflects that no one "revealed" her identity; instead, Ritter surmised that she was the complainant, since he was aware that she had recently made a similar, non-anonymous complaint to Boening. (Doc. 87, Exhibit 4 at 13). The investigation cases relied on by the plaintiff were decided in the very different context of racial and sexual harassment and are thus inapposite.

Finally, the plaintiff notes that Roberson's starting salary was higher than all four project controllers. (Doc. 86 at 14-16). Even she does not believe this is really evidence of pretext, because she insists that the job functions and experience requirements of project controllers are "distinctly different from" those of lead operations controllers. (*Id.* at 14). Since the project controllers are not fit comparators, it can scarcely matter that Roberson was paid more than they. Moreover, since three of the four project controllers are white, (Doc. 88 at 27-29), and both the black project controller and the plaintiff made more than any of them, (Doc. 86 at 15), the picture they paint is of non-discrimination, not pretext.

On a number of related grounds, the plaintiff challenges the defendant's asserted reliance on Roberson's MBA. (Doc. 76 at 8-9; Doc. 86 at 6-9; Doc. 95 at 11). As noted previously, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each* of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037 (emphasis added). Because the plaintiff has not produced sufficient evidence for a reasonable factfinder to conclude that, in explaining why Roberson's salary is higher than hers, the defendant's asserted reliance on experience, salary history and salary demand is pretextual, it is unnecessary to slog through an evaluation of the plaintiff's arguments concerning the MBA; even could the plaintiff show a genuine issue of fact as to whether that proffered reason is pretextual, she would still lose, since she cannot do so as to the other proffered reasons.

## II. Vacation.

Based on the discussion in Part I.A, it is clear that the plaintiff can establish a prima facie case of race discrimination concerning vacation. As its legitimate, non-discriminatory reason for awarding Roberson three weeks vacation and the plaintiff only the standard two weeks, the defendant asserts that Roberson negotiated for the third week, while the plaintiff did not attempt to do so. This is a legally sufficient reason, and it is supported by record evidence; the plaintiff does not argue otherwise. Thus the inquiry turns to the plaintiff's evidence of pretext.

There is no question that the plaintiff did not attempt to negotiate for more than two weeks of vacation, as she admits she did not. (Doc. 88 at 8-10). Her only effort to show pretext is to argue that Roberson also did not negotiate for the third week but received it on the unilateral impulse of the defendant, which did not extend the same courtesy to her.

The record, however, could not be clearer that Roberson negotiated for a third week of vacation. She mentioned it to O'Brien before receiving an offer letter and thought the matter had been resolved. When the offer letter arrived with no mention of vacation, Roberson promptly e-mailed O'Brien with this message: "During our discussions we agreed to three weeks vacation each year. I further recall that I will begin accruing vacation immediately at the start of my employment. Please confirm our agreement regarding vacation." O'Brien responded that "TK will commit to 3 weeks vacation starting Jan 1, 2009 …." Only then did Roberson accept the offer of employment. (Doc. 72, Exhibit L at 2; *id.*, Exhibit J at 36-37, 48-49, 53-54; Doc. 83, Exhibit A, and Exhibit B thereto).

The plaintiff nonetheless gamely attempts to create a fact issue. First, she notes that Roberson testified she did not "disagree with anything in [her] offer letter" and "made no special demands or asked for anything more … [a]fter the offer letter." (Doc. 76, Exhibit C at 12). This testimony is consistent with the evidence recited above, since

Roberson did not disagree with anything in the offer letter but with something omitted from it, and she asked for nothing more after receiving the offer letter but merely reminded O'Brien of something that had already been agreed upon.  At any rate, the plaintiff does not contend that the e-mail string between Roberson and O'Brien is a fabrication, and given its authenticity Roberson's deposition testimony, to the extent it could otherwise support the plaintiff's position, could not possibly be accurate and thus cannot create a genuine issue of material fact.  *Cf. Harris v. General Motors Corp.*, 201 F.3d 800, 803 n.1 (6th Cir. 2000) ("Obviously, where the only evidence submitted by a non-movant is contradicted by indisputable physical facts, there can be no genuine issue of material fact for trial.").

The plaintiff's only other objection is that Roberson's file, unlike that of Estes (who also negotiated for a third week of vacation), does not contain a confirming addendum.  Given the irrefutable evidence discussed and quoted above, the absence of such a document cannot possibly draw into question whether Roberson negotiated for a third week of vacation.

## CONCLUSION

The plaintiff asked to be paid $85,000, and her request was honored by a black decision-maker.  A white applicant also asked to be paid a specific but higher amount, and her request was likewise honored, by a different decision-maker who showed favoritism to the white applicant because of friendship.  This is not the stuff of which successful race discrimination suits are made, and the plaintiff's extensive effort to create an issue of pretext, based largely on insupportable readings of the factual record, falls well short.  Her claim of race discrimination regarding vacation is equally meritless.  It should not have required 400 pages of briefing and ancillary motions to reach this point in such a clear-cut case.

For the reasons set forth above, the plaintiff's motion for summary judgment is **denied** and the defendant's motion for summary judgment is **granted**.  Judgment shall be entered accordingly by separate order.[32]

DONE and ORDERED this 13th day of October, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[32] The defendant's three motions to strike, (Docs. 84, 93, 104), are **denied**.